**IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **ERNEST W. FREY, surviving** | ) | |
| **son and Guardian of Gerladine Frey,** | ) | |
| **deceased,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No.  07-CV-468-TCK-FHM** |
| | ) | |
| **(1) AT&T MOBILITY, LLC, formerly** | ) | |
| **Cingular Wireless, and** | ) | |
| **(2) AT&T CORP.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

**OPINION AND ORDER**

Before the Court is Defendants' Motion to Dismiss Plaintiff's Complaint in Part (Doc. 18),

wherein Defendants move to dismiss Plaintiff's first and second causes of action.

**I.     Factual Background**

The following facts are alleged in the Complaint.   In 2004, Plaintiff Ernest W. Frey

("Ernest") contracted with Cingular Wireless, LLC ("Cingular") for cell phone service and provided

the cell phone to his mother, Geraldine Frey ("Geraldine"), for her safety and security.[1]   Ernest did

so in response to a Cingular advertisement stating that "cell phones provided additional safety and

security to users since they could call from almost any location."  (Compl. ¶ 5.)   Ernest further

---

[1]  Relevant actions in this action were taken by Cingular employees.  Cingular is now
known as AT&T Mobility, LLC ("AT&T Mobility"), which is owned by Defendant AT&T
Corp. ("AT&T Corp.").   AT&T Mobility and AT&T Corp. ("Defendants") are the named
Defendants.

1

alleges that because of the advertising he saw, "he believed that Cingular's service included assistance in ascertaining the relative location of his motion when she used the cell phone." (*Id.* ¶ 28.)

On July 26, 2005, Geraldine did not show up for a 9:30 a.m. doctor's appointment, although Geraldine had spoken with the doctor's office that morning at 8:30 a.m.  Unable to contact or locate Geraldine, Ernest filed a missing person report with the Tulsa Police Department ("TPD").  On July 27, 2005, at about 11:46 a.m., Ernest contacted Cingular for assistance in monitoring the cellular phone so that if Gerladine used the phone, her general location could be ascertained through the nearest cell phone tower.  Ernest "explained to the Cingular employee the gravity of the situation, given his mother's age, her medical condition, the hot weather, and the high probability of danger to Geraldine." (*Id.* ¶ 12.)  Cingular knew that Ernest was its customer and that the phone service was in Ernest's name.

In response to Ernest's requests, the Cingular employee (1) provided Ernest with the general 1-800 customer service number, (2) advised him that he could call back to see if the cell phone had been used, and (3) informed him that, even though he was the customer, he would need a subpoena to obtain the number and cell tower location for any calls placed.  Over the next few days, Ernest made a "number of phone calls to follow up, but could not get through on [Cingular's]  800 number system." (*Id.* ¶ 16.)  Acting on the missing persons report, the TPD contacted Cingular and was also told that a subpoena would be required.

On August 3, 2005, Ernest was informed by a Cingular representative that the cell phone had been turned on and used on July 27, 2005, at 2:40 p.m., which was the same day Ernest first notified Cingular of the situation.  Ernest pled with the Cingular employee to provide him with the tower

location.  Cingular refused to release this information, or the number called, without a subpoena.  On August 15, 2005, the Oklahoma Attorney General's Office ("AG") issued a subpoena, but Cingular lost it.  On August 17, 2005, the AG reissued the subpoena.  On September 1, 2005, Cingular sent the subpoenaed information to the TPD in coded form.  After days of decoding the information, it was discovered that the information did not contain the cell tower location.  Upon being informed of this problem, a Cingular employee told Ernest that the location of the cell tower would not be provided without a "court order."[2]

On September 3, 2005, Cingular provided the latitude/longitude of the cell tower from which the July 27, 2005 call was made.  On September 8, 2005, Cingular informed Plaintiff that it "[was] not sure of the actual sector covered from the tower and that the search should be extended to 360 degrees for 6-8 miles from the tower."  (*Id.* ¶ 26.)  On October 15, 2005, Geraldine's body was found dead.  According to the Complaint, Geraldine was "fatally injured."  (*Id.* ¶ 33.)

Ernest brought suit against Defendants alleging three causes of action: (1) "loss of chance," (2) breach of contract, and (3) intentional infliction of emotional distress.  As to the "loss of chance" cause of action, Ernest alleged:

> Pursuant to the contract for cell phone services and the advertising of making cell phone users safer and more secure, Cingular had a duty to [Ernest].  Cingular breached its duty when it failed to provide assistance in ascertaining the relative location of the last cell phone call made from the cell phone used by [Geraldine].  The breach of duty by Cingular more likely than not caused damage to Plaintiff.  Defendant, CINGULAR, was negligent in failing to provide information to [Ernest], upon his initial request, concerning the last call made from his cell phone and the cell tower location.  As a direct and proximate result of the negligent and/or intentional acts of CINGULAR, [Geraldine] lost her chance of being rescued, suffered great pain of body and mind, and was fatally injured.  CINGULAR either negligently, or

---

[2] It is unclear whether the Cingular representative was referring to a "court order" other than a subpoena, or if that representative was unaware of the previous subpoenas.

through its grossly negligent, deliberate, and/or intentional refusal to cooperate and provide essential data and information to [Ernest], in a timely fashion, [Geraldine] died.

(*Id.* ¶¶ 29-34.)  As to the breach of contract cause of action, Ernest alleged:

[Ernest] and Cingular entered into a contract for services based on the advertising that a cell phone would provide additional security and safety for his elderly mother and Ward, [Geraldine].  Cingular breached the contractual promise of safety and security which its cell phones provide to the elderly, by refusing to timely provide information concerning the time and approximate location of the last  phone call(s) made to or from the cell phone described herein above, even though Cingular had the information and knew that such information was critical to Plaintiff's efforts to locate his mother who was using the Cingular cell phone.

(*Id.* ¶¶ 37-38.)  Defendants moved to dismiss these first two causes of action, arguing that Ernest failed to state a claim upon which relief can be granted and that dismissal is proper pursuant to Federal Rule of Civil Procedure 12(b)(6).

## II.    Legal Standard

"The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief may be granted."  *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991).  In making this determination, all well-pleaded factual allegations in the complaint are accepted as true and viewed in the light most favorable to the nonmoving party.  *GFF Corp. v. Associated Wholesale Grocers, Inc.*, 130 F.3d 1381, 1384 (10th Cir. 1997). "A 12(b)(6) motion should not be granted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Id.* (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

4

### III.   Loss of Chance

In his Complaint, Ernest labeled his first cause of action as one for "loss of chance," which is a type of negligence action under Oklahoma law in which a plaintiff is entitled to a relaxed burden of production on the issue of causation.  *See McKellips v. Saint Francis Hosp.*, 741 P.2d 467, 475 (Okla. 1987) (explaining that the lost chance doctrine "lowers a plaintiff's burden of production to enable him/her to more easily establish a jury question on the issue of causation on a showing of substantial decrease in the chance of survival");[3] *see also Hardy v. Southwestern Bell Tel. Co.*, 910 P.2d 1024, 1026 (Okla. 1996) (explaining that a plaintiff asserting lost chance cause of action may reach the jury "not only with evidence of increased risk, but also with evidence of substantial decrease in chances for survival").  Defendants argue that Ernest's claim for "loss of chance" must be dismissed because such a cause of action is limited in Oklahoma to cases involving medical malpractice.

In *Hardy*, a plaintiff alleged that a telephone service provider was negligent in allowing its phone system to "lock up," thereby preventing a plaintiff from placing a 911 call when the plaintiff's wife suffered a heart attack.  A federal court concluded that the plaintiff could not meet his burden

---

[3]  In *McKellips*, the court more fully explained the lost chance doctrine:

> An evolving trend has developed to relax the standard for sufficiency of proof of causation ordinarily required of a plaintiff to provide a basis upon which the jury may consider causation in the "lost chance of survival" cases. In the typical loss of a chance case, a plaintiff already has a condition or is subject to risk from a hazard, unlike a healthy plaintiff in most personal injury cases. A plaintiff claims the negligence has increased the risk of harm by hastening or aggravating the effect of the pre-existing condition or risk. . . . Often times these cases are problematic as the tort may prevent a determination of whether the exercise of due care under the circumstances could have produced a better result.

741 P.2d at 471-72.

5

of proof in a "traditional negligence action" because the plaintiff "failed to make the necessary causal connection between the delay caused by the system failure and the decedent's death."   *Id.* However, the federal court certified the following question to the Oklahoma Supreme Court in order to determine if the reduced standard of causation set forth in *McKellips* could apply to the facts presented:

> Does the lost chance of survival doctrine set out in *McKellips v. Saint Francis Hosp., Inc.*, 741 P.2d 467 (Okla.1987), and restricted therein to certain limited types of medical malpractice actions, apply in an ordinary negligence case that is not brought against a medical practitioner or hospital?

*Id.*  The Oklahoma Supreme Court answered in the negative and held that "an action for loss of chance of survival may not be expanded to apply in an ordinary negligence action brought against one other than a medical practitioner or a hospital."   *Id.*   In refusing to expand the lost chance doctrine outside the medical malpractice context, the court reasoned:

> The public policy concerns of medical practice which have been held to justify a reduced burden of causation in lost chance cases do not transfer over to ordinary negligence cases. Public policy is not served by extending the causation exception to the "but for" rule to other tortfeasors. Under the decisions discussed and other "loss of chance" medical provider opinions, the physician had the opportunity to perform properly under the terms of the physician-patient special relationship but was alleged to have failed to do so.  The essence of the doctrine is the special relationship of the physician and the patient. In these cases the duty is clear, the negligence is unquestioned and the resulting harm, the destruction of a chance for a better outcome, has obvious value and is not so speculative as to be beyond being reasonably considered a result of defendant's negligence.

*Id.* at 1029.

In this case, Ernest has sued a wireless service provider and has not sued a medical practitioner or hospital.  Accordingly, his allegations fail to state a claim for the "loss of chance" cause of action recognized by the Oklahoma Supreme Court in *McKellips*.  The practical effect of the Court's ruling is that Ernest is not entitled to the "lower[ed] . . . burden of production to enable

6

him [] to more easily establish a jury question on the issue of causation on a showing of substantial decrease in the chance of survival," which is authorized only in medical malpractice cases. *See McKellips*, 741 P.2d at 475; *Hardy*, 910 P.2d at 1026. *Cf. Blinzler v. Marriot Int'l, Inc.*, 81 F.3d 1148, 1153 (1st Cir. 1996) (recognizing cause of action for loss of chance of survival in context other than medical malpractice) (distinguishing *Hardy* because, unlike Oklahoma law, New Jersey law allowed a reduced standard of causation, *i.e.*, a "substantial possibility" standard, in all "loss of chance" cases regardless of the status of the entity sued); *Pelas v. Golden Rule Ins. Co.*, No. 97-3779, 1999 WL 438478, at * 2-3 (E.D. La. June 28, 1999) (recognizing cause of action for loss of chance of survival in context other than medical malpractice ) (rejecting rationale of *Hardy* because, unlike Oklahoma law, Louisiana law does not relax the burden of proof in lost chance cases "but rather recognizes the distinct injury of the loss of a less-than-even chance of survival and retains the ordinary burden of proving causation of that distinct injury").

## IV.     Negligence

Although Ernest has not stated a claim for a "loss of chance" cause of action, and is therefore not entitled to the relaxed standard of causation explained in *McKellips*, the Court must also determine if his allegations state a claim for ordinary negligence. (*See* Compl. ¶¶ 29-34 (alleging three elements of ordinary negligence cause of action).)  Under Oklahoma law, the elements of negligence are:  "(1) a duty owed by defendant to plaintiff, (2) defendant's breach of that duty, and (3) injury to plaintiff caused by defendant's breach of that duty." *Lowery v. Echostar Satellite Corp.*, 160 P.3d 959, 964 (Okla. 2007).  Although Defendants' arguments are couched in terms of Ernest's inability to state a claim for loss of chance, Defendants have essentially challenged Ernest's ability to state a claim as to the first and third elements.

A.    **Duty**

"The existence of a duty of care is the threshold question in any negligence action." *Lowery*,

160 P.3d at 964.  "A duty of care is an obligation owed by one person to act so as not to cause harm

to another." *Id.*  "Whether the defendant owed the plaintiff a duty of care is a question of law for

the court in a negligence action." *Id.*  "If a defendant does not owe a duty of care to the plaintiff,

there can be no liability for negligence as a matter of law." *Id.*  A duty can be grounded in "contract

or some special relationship," or it can be grounded in "general principles of the law of negligence."

*Id.*

1.    *Contractual Assumption of Duties*

Ernest alleges that the duty owed by Cingular to Ernest arose from "the contract for cell

phone services and the advertising of making cell phone users safer and more secure." (Compl. ¶

29.)  Ernest further alleges that because of the advertising he saw, "he believed that Cingular's

service included assistance in ascertaining the relative location of his motion when she used the cell

phone." (*Id.* ¶ 28.)  Defendants argue that the Oklahoma Supreme Court's decisions in *Coker v.

Southwestern Bell Telephone Company*, 580 P.2d 151 (Okla. 1978), and *Hardy*, 910 P.2d 1024, both

of which addressed the negligence of telephone service providers, preclude a finding of duty arising

from the cellular service contract between Ernest and Cingular.

Ernest's Complaint clearly alleges that Cingular owed a contractually assumed duty to

Ernest, and the Court concludes that such a duty is not precluded by the Oklahoma case law cited

by Defendants.  The Oklahoma Supreme Court did not discuss, in either *Coker* or *Hardy*, whether

the telephone service provider owed a contractual duty to the plaintiff.  Instead, the court determined

that any negligence by the telephone service provider was too attenuated from the alleged injury to

8

satisfy the *causation* requirement applied in ordinary negligence actions.  *See Hardy*, 910 P.2d at 1030 (explaining that plaintiff had not presented a convincing argument for extending the lost chance doctrine to facts presented because "[p]laintiff's claim of causation is far too speculative and too remote to be sustained here"); *Coker*, 580 P.2d at 154 (holding that petition failed to state a claim for negligence against telephone service provider because "[t]he number and character of random elements which must come together in precisely the correct sequence at exactly the right time . . . so far remove appellee's act of negligence . . . as to break any asserted *causal connection*") (emphasis added).

In addition, the court did not discuss the specific terms of the telephone service contracts at issue in *Coker* and *Hardy*, and any such contracts may be quite different from the contract at issue here. The cellular service contract between Ernest and Cingular was more recently drafted and involves wireless phone services, rather than standard telephone service.  Indeed, Ernest alleges that his contract included certain promises regarding customer safety that may be unique to wireless services.  Therefore, the Court is unwilling to decide whether Cingular owed Ernest a contractually assumed duty based solely on *Coker* or *Hardy*, and without affording Ernest the opportunity to submit evidence regarding the terms of the contract. *See Peck v. Horrocks Eng'rs, Inc.*, 106 F.3d 949, 952-53 (10th Cir. 1997) (analyzing terms of contracts to determine if defendants contractually assumed any duty to the plaintiff).

### 2. *Duty Arising from Common Law*

#### a. <u>Restatement (Second) of Torts § 323/"Good Samaritan Rule"</u>

Ernest seeks to invoke a duty analogous to that set forth in Restatement (Second) of Torts

§§ 323, 324A (1965).  Section 323 provides:

Negligent Performance of Undertaking to Render Service

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if (a) his failure to exercise such care increases the risk of such harm, or (b) the harm is suffered because of the other's reliance on the undertaking.

Restatement (Second) of Torts § 323 (1965).[4]  Section 323 was recently referred to by the Oklahoma

Supreme Court as the "good samaritan rule."  *See Lowery*, 160 P.3d at 964; *see also Thames*

*Shipyard and Repair Co. v. United States*, 350 F.3d 247, 261 (1st Cir. 2003) (explaining that "the

Good Samaritan rule . . . makes one person liable to another for breach of a duty voluntarily assumed

by affirmative conduct, even when that assumption of duty is gratuitous") (quotation omitted).

Section 323 represents an exception to the general common law rule that a stranger has no moral

obligation to aid another human being in danger.  *See Podias v. Mairs*, 926 A.2d 859, 863-66 (N.J.

2007) (explaining common law rule that there is "no independent duty of rescue" but also explaining

numerous and varied exceptions to this rule).

---

[4] Section 324A is a "parallel" provision to § 323 but deals with a tortfeasor's liability to third persons, rather than to the person in privity of contract with the tortfeasor.  *See id.* § 324A (entitled "Liability to Third Person for Negligent Performance of an Undertaking").  In this case, Ernest was the individual in privity of contract with Cingular, and Ernest seeks to recover on his own behalf.  (*See* Compl. ¶¶ 35, 39, 42.)  Therefore, § 323 is the more relevant provision.

10

The Court finds that Ernest's reliance on § 323 to impose a duty upon Cingular is misplaced. First, the Court does not view a cellular phone service as one that the service provider "should recognize as necessary for the protection of the other's person or things." Restatement (Second) of Torts § 323 (1965). In Oklahoma, §§ 323 or 324A have been applied in cases involving services provided by a landlord, a security company, and a security guard. *See Lay v. Dworman*, 732 P.2d 455, 459 (Okla. 1986) (plaintiff who was raped in her apartment alleged landlord acted negligently by failing to repair defective locks after landlord was placed on notice of defect and criminal activity in complex) (explaining that "a third area of liability in the landlord-tenant relationship arises out of the principles embodied in [§ 323]" and holding that landlord owed a duty of care in the circumstances presented); *Truitt v. Diggs*, 611 P.2d 633, 636 (Okla. 1980) (parents of fatally shot student alleged that independent contractor hired by Oklahoma City school system to make recommendations to school board regarding safety procedures acted negligently by basing recommendations on incomplete information) (relying on § 324A and holding that the plaintiff's factual allegations, if not defective for other reasons, would have been sufficient to state a negligence claim against security company); *Wiles v. Grace Petroleum Corp.*, 671 P.2d 682, 687 (Okla. Civ. App. 1983) (wife of man who was fatally shot on his job site alleged that security guard on duty at time of accident acted negligently by fleeing the scene after seeing criminal activity in progress) (explaining that plaintiff's theory of tort liability was consistent with § 324A and holding that plaintiff's petition stated a claim). In contrast, the Oklahoma Supreme Court refused to impose a § 323 duty upon a company rendering satellite dish services. *See Lowery*, 160 P.3d at 966. The service provided in this case, cellular phone service, is only tangentially related to "protection" and

is distinguishable from the provision of security, landlord, or other services more directly tied to the protection of another's person or property.[5]

Second, Ernest does not allege that Cingular actually undertook any "rescue" efforts.  Section 323 most commonly applies when an individual has started rescue efforts but then abandons such efforts or completes them in a negligent manner.  *See* Restatement (Second) of Torts § 323 (1965), illustration 1 (where employer provides a ride home to a sick employee in a company vehicle, but then employer refuses to take employee all the way home and forces her to walk, employer is liable for increase in employee's illness caused by her exertion and exposure to rainy weather).  In contrast, § 323 does not extend to situations in which an individual "never commence[s] performance at all," which is described in the Restatement as "non-feasance."  *Id.* at cmt. d.  In this case, Ernest's allegations are that Cingular failed to commence any sort of "rescue" efforts, not that Cingular began rescue efforts but then abandoned the efforts or completed the rescue efforts in a negligent manner.  (*See* Compl. ¶ 30 (asserting that Cingular breached its duty "when it failed to provide assistance to [Ernest] in ascertaining the relative location of the last cell phone call").)  Ernest alleges that Cingular did not provide any helpful information until required to do so by subpoena.  Ernest's factual allegations do not give rise to a duty of care imposed upon "good samaritan rescuers" because Cingular did not voluntarily undertake any rescue efforts.[6]

---

[5]  As explained above, Cingular may have made express or implied promises regarding its customers enjoying an increased level of safety.  However, the Court finds that such promises, if in fact made, are better analyzed as contractually assumed duties than as common law duties arising based solely on the nature of the protective service provided.

[6]  The Complaint contains allegations of negligent handling or compliance with the subpoena.  (Compl. ¶¶ 21-26.)  However, the Court does not consider compliance with a subpoena to be a "good samaritan" effort undertaken by Cingular "gratuitously or for consideration," and § 323 does not apply to these actions.

Finally, Ernest does not allege that, once contacted by Ernest, Cingular employees promised to assist Ernest and then failed to follow through, such that Ernest relied on this promise and forewent other rescue opportunities.  Instead, Ernest alleges that all other possible search efforts were employed in spite of Cingular's non-cooperation.  (*See* Compl. ¶ 18 (explaining that search efforts were organized and ongoing during period of alleged negligence).)  Therefore, even assuming a mere promise can give rise to a § 323 duty, *see* Restatement (Second) of Torts § 323 (1965), cmt. d (explaining that it is an open question whether "a mere promise, without in any way entering upon the performance, is an undertaking sufficient to make the promisor liable"), Cingular did not make any such promise or take any actions that resulted in Ernest's detrimental reliance.  *See Miller v. Arnal Corp.*, 632 P.2d 987, 992 (Ariz. 1981) (holding that trial court properly refused to give instruction based on an undertaking to render services because the plaintiff did not rely on any rescue undertaking "in the sense that he chose recuse by the ski patrol over any other available alternative").  The Court concludes that § 323, as applied in Oklahoma case law and explained in the Restatement, does not apply to Ernest's allegations because Cingular did not "undertake[], gratuitously or for consideration, to render services to [Ernest or Geraldine] which [it] should recognize as necessary for the protection of [Ernest's or Geraldine's] person or things."  *See* Restatement (Second) of Torts § 323 (1965).[7]

---

[7]  The Court finds that § 323 does not apply to Cingular's actions.  Therefore, the Court does not reach the legal issue raised in the briefing of whether § 323's "increased risk of harm" causation standard has application under Oklahoma law in cases other than medical malpractice.  In limiting the "lost chance doctrine" to medical malpractice, the Oklahoma Supreme Court expressed a reluctance to extend any type of relaxed causation standard, such as that set forth in § 323, to ordinary negligence actions.  *See Hardy*, 910 P.2d at 1029; *McKellips*, 741 P.2d at 472 & n.4 (explaining that the "concept" underlying the lost chance doctrine "was first recognized in non-medical negligence cases in failure to attempt to rescue situations" but then limiting the doctrine to medical malpractice cases); *see also Blinzler*, 81 F.3d at 1153 (explaining that the

**b.** **Duty Arising From Circumstances Requiring a Defendant to Foresee Particular Harm to Plaintiff**

Although not directly cited by Ernest, the Court finds Ernest's allegations sufficient to invoke a common law duty explained by the Oklahoma Supreme Court in *Lowery v. Echostar Satellite Corporation*, 160 P.3d 959, 964 (Okla. 2007):

> We have long recognized that *without regard to the relationship of the parties*, a person owes a duty of care to another person whenever *the circumstances* place the one person in a position towards the other person such that an ordinary prudent person *would recognize* that if he or she did not act with ordinary care and skill in regard to the circumstances, he or she *may cause danger of injury* to the other person. We have explained that a duty of care may arise from a set of circumstances which would require the defendant to foresee the particular harm to the plaintiff.

(citation omitted) (emphasis added).  This duty is grounded not in any contractual or special relationship of the parties but in the relationship created by the specific circumstances that are presented and known to the alleged tortfeasor.  In this way, the duty is similar to that arising under § 323 but does not appear to require that the tortfeasor provide protective services or undertake rescue efforts.  In determining whether this common law duty applies, the court "considers policy factors that lead the law to say a particular plaintiff is entitled to protection." *Id.* "The most important consideration in determining the existence of a duty of care is foreseeability of harm to

---

Oklahoma Supreme Court considered, but declined to "extend[] the causation standard of Restatement § 323 to loss of chance claims outside the medical malpractice context").  However, the Oklahoma Supreme Court has applied § 323 and its "increased risk of harm" causation standard outside the medical malpractice context. *See, e.g., Truitt*, 611 P.2d at 636 (holding that the plaintiff stated a claim because security company's failure to exercise reasonable care "increased the risk of harm to the plaintiff").  It has also recently considered whether § 323 imposed a duty upon a satellite dish company, indicating that § 323 has at least some form of continued application. *See Lowery*, 160 P.3d at 964.

the plaintiff." *Id.*[8]  The finding of a duty based on the foreseeable risk of harm "will not generally be extended beyond reason and good sense." *Id.*

In *Lowery*, the Oklahoma Supreme Court addressed whether a satellite dish company owed this common law duty of care to a non-customer who fell from a rooftop while attempting to repair a satellite dish, while she was on the phone with and receiving instructions from a customer service representative of the company.  The court affirmed a grant of summary judgment for the company on the question of duty, holding that the "totality of the facts and circumstances established" that the company did not owe a duty to protect the plaintiff "from the danger she encountered because of her desire to have the satellite dish repaired and her decision to climb on the roof to repair it." *Id.* at 965.  The court's decision turned, at least in part, on the plaintiff's failure to present evidentiary materials at the summary judgment stage showing that the company "had control over the dangerous conditions" or was "in a superior position to protect her from the danger she encountered." *Id.* at 965.

In this case, Ernest alleges to have informed Cingular employees that his elderly mother was missing, such that they were aware of the specific circumstances of the potentially dangerous situation.  Ernest further alleges that these employees had exclusive access to information that would have helped him locate her.  Thus, Cingular employees were at least arguably in a position toward Ernest and/or Geraldine such that "ordinary prudent people" would have recognized that if they did

---

[8]  Foreseeability is important to the question of duty and to the question of causation, although for different reasons.  "Foreseeability as an element of duty of care creates a 'zone of risk' and is a minimum threshold legal requirement for opening the courthouse doors," while "[f]oreseeability as an element of proximate cause is a much more specific factual requirement that must be proved to win the case once the courthouse doors are open." *Delbrel v. Doenges Bros. Ford, Inc.*, 913 P.2d 1318, 1322 (Okla. 1996).

not act with ordinary care and skill in regard to the circumstances, *i.e.*, by timely providing the information in their possession, they may cause danger of injury to Ernest and/or Geraldine. *See id.* at 964. Based on the precise circumstances presented to the customer service representative in *Lowery*, the court concluded it was "beyond good sense" to impose a duty flowing from the representative to the non-customer who chose to traverse her roof in an attempt to repair a satellite dish. The court is not convinced, at least at this stage of the proceeding, that it is "beyond good sense" to impose a duty upon Cingular to timely provide its customer with relevant information regarding the location of a cell phone for which he pays, particularly when Cingular was presented with information that its customer's elderly mother possessed the cell phone and had been missing for over twenty-four hours. The Court therefore finds that a Rule 12(b)(6) dismissal is not appropriate.[9]

### B.     Causation

The Court is allowing the case to proceed on two "duty" theories:  (1) contractually assumed duty, and (2) a common law duty arising from "a set of circumstances which would require the defendant to foresee the particular harm to the plaintiff." *See Lowery*, 160 P.3d at 964. Neither

---

[9] Again, the facts are distinguishable from those presented in *Coker* and *Hardy* because the question of duty was not specifically addressed in those cases. In addition, *Coker* and *Hardy* involved technical failures of the phone system or phone equipment. The specific harms eventually suffered by the plaintiffs in *Coker* and *Hardy* – a fire and dying of a heart attack – were not readily foreseeable as a result of faulty phone service. Any number of problems could arise from a locked-up phone system or a malfunctioning pay phone in a tavern. The harm suffered was more foreseeable in this case because the circumstances creating the emergency – the fact that Geraldine was elderly and missing – was communicated to Cingular employees during the crisis situation.

theory involves a relaxed burden of production as to causation, and ordinary causation principles apply.[10]

"Liability for negligence in acting or failing to act attaches where such negligence is the proximate cause of the injury." *Coker*, 580 P.2d at 154; *see also Lay*, 732 P.2d at 460 ("[A]n alleged breach of duty must proximately result in the injury to the party seeking recovery for that injury."). However, "[p]roximate cause does not mean the 'actual cause' of an injury." *Coker*, 580 P.2d at 154. Instead, "[i]f the alleged negligence of the defendant when commingled with the other operating agency is an efficient and contributing concurrent cause, then the negligence may be said to be the 'proximate cause' of the injury." *Id.* "Whether considered alone or in conjunction with some other operative agent, the negligence must be the efficient cause which sets in motion the subsequent chain of events leading to the injury rather than merely furnishing a condition by which injury was possible." *Id.* "The distinction between a cause and condition is the element of foreseeability." *Tomlinson v. Love's Country Store*, 854 F.2d 910, 916 (Okla. 1993). Like an actual "cause," a mere "condition" also involves a breach of a duty of care. *Id.* However, "[w]ith a [mere] condition . . . the subsequent injury was neither foreseeable nor reasonably anticipated as the probable result of the breach." *Id.*

The key allegations of negligence in this case are that (1) Cingular acted negligently by initially refusing to provide any information to Ernest and, (2) when it provided information pursuant to a subpoena, it did so in a negligent manner. The alleged harm resulting from this negligence has two components: (1) damage resulting to Ernest, as the cell phone customer, flowing

---

[10] For reasons explained above, the Court rejects Ernest's reliance on cases requiring only a showing of an "increased risk of harm" to the plaintiff, and the Court will apply ordinary causation principles.

from his non-receipt of this information (*see* Compl. ¶ 31); and (2) damage to Ernest flowing from the death of his mother (*see* Compl. ¶ 33). The question is whether the alleged negligence is too remote from the injuries suffered to be considered a proximate cause, such that dismissal is warranted.

First, with respect to alleged damages suffered directly by Ernest based on Cingular's negligent failure to provide him with the requested information regarding his mother, the Court finds that such damages are not so attenuated from the negligence that dismissal is warranted.

Second, with respect to damages Ernest suffered flowing from the death of his mother, this presents a closer question. Defendants argue that, based on the Oklahoma Supreme Court's decisions in *Coker* and *Hardy*, any alleged negligence by Cingular is too remote from Geraldine's death to be considered a proximate cause thereof. In *Coker*, the Oklahoma Supreme Court affirmed dismissal of a plaintiff's cause of action, finding that it failed to state a negligence claim against a telephone company. *Coker*, 580 P.2d at 154. The plaintiff had repeatedly informed the defendant telephone company that a pay phone within his tavern was non-operative. The telephone company failed to fix the pay phone. When the plaintiff's place of business caught on fire, the plaintiff attempted to call the fire department but was unable to do so on the malfunctioning pay phone. The plaintiff predicated liability on his "inability to use the telephone for the purpose of timely summoning emergency assistance to extinguish the fire." *Id.* at 152. The court held that the "facts pled are simply not sufficient to allege the requisite causal connection between the negligent conduct of the appellee and the resulting damages." *Id.* The court reasoned:

> In order to establish the causal connection between the defective telephone and the ultimate destruction of appellant's place of business it is necessary to heap conclusion upon conclusion as to the course events would have taken had the telephone operated properly. . . . The number and character of the random elements

18

> which must come together in precisely the correct sequence at exactly the right time in order for it to be established that failure of telephone service was an efficient cause of appellant's loss so far remove appellee's act of negligence from the ultimate consequences as to break any asserted causal connection. The failure of phone service is too remote from the loss sustained to establish grounds for recovery.

*Id.*; *see also Hardy*, 910 P.2d at 1026-30 (plaintiff's wife died from a heart attack after plaintiff was unable to dial 911, allegedly due to phone company's negligent decision to allow sale of Garth Brooks concert tickets by phone) (reasoning that the "trier of fact in the instant case would [] be forced to heap conclusion upon conclusion as to the course events would have taken if the 911 system had worked properly and have no more than mere conjecture as to what damages plaintiff suffered by reason of defendant's actions").

The Court concludes that *Coker* and *Hardy* are distinguishable, at least for purposes of a motion to dismiss. Unlike the plaintiffs in *Hardy* and *Coker*, Ernest does not allege that any technical failure of the cell phone service was a proximate cause of his mother's death. He alleges that Cingular's failures to provide information in its possession – when directly confronted with an emergency situation involving a missing person – was a proximate cause of Geraldine's not being found and ultimately her "fatal injury." (*See* Compl. ¶¶ 29-34.) Construed in their most favorable light, Ernest's allegations of Cingular's negligence are less "remote" from Geraldine's death than the allegations in *Coker* or *Hardy*, and Ernest's allegations are sufficient to survive a Rule 12(b)(6) motion. However, the Court anticipates additional argument and briefing on this question at the summary judgment stage.

## V.     Breach of Contract

Defendants first argue that Ernest has failed to plead a particular contractual promise or set forth the terms of the relevant service agreement or advertisement. Ernest contends that he "has not

yet located his agreement" or the advertisement but should have the opportunity to conduct discovery. The Court finds that Ernest's allegations at Paragraphs 37 and 38 of the Complaint, which allege the existence and terms of a cellular service contract, breach of the terms, and damages, are sufficient to plead a claim for breach of contract.

Defendants' second argument is that Ernest's alleged damages are "too speculative and uncertain" to support a breach of contract claim. *See Coker*, 580 P.2d at 153 (affirming dismissal of breach of contract claim against telephone company because "[i]t cannot seriously be suggested that [the parties] contemplated in their contract that [the phone company] would act as an insurer for fire damage to appellant's building in the event the telephone equipment failed to operate upon the possible occurrence of a fire"). Ernest argues that "both parties knew the advertising induced [Ernest] to purchase the cell phone because the safety features of a cell phone given to a family member included being able to assist in locating that family member" and that the harm alleged was reasonably contemplated by the contracting parties. (Resp. to Mot. to Dismiss 12.) The Court finds that Ernest's alleged contract (which included a promise or inducement that a cell phone service was of assistance in locating a family member) and Ernest's alleged harm (damages flowing from an alleged failure to assist in locating a family member) are not so attenuated that dismissal is required. Instead, if the facts are as alleged by Ernest, it is possible that the alleged damages "may reasonably be supposed to have been in the contemplation of both parties, at the time they made the contract." *See Coker*, 580 P.2d at 153 (quotation omitted).

For reasons explained above, Defendants' Motion to Dismiss Plaintiff's Complaint in Part (Doc. 18) is DENIED. The parties are hereby ordered to submit a new Joint Status Report no later than October 1, 2008, and the Court will enter a new schedule to govern the remainder of the case.

ORDERED this 23rd  day of September, 2008.

TERENCE KERN,
UNITED STATES DISTRICT JUDGE